IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JACK L. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-104-TLW |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff, Jack L. Johnson, requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying plaintiff's application for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 11). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Plaintiff appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that plaintiff was not disabled.

### Claimant's Background

Plaintiff is a 52 year-old male with a tenth grade education. (R. 31, 305). He worked as a route salesman for Canteen Company from 1989 through 1994, then as a remodeler with his brother from 2001 through 2007. (R. 33). When questioned by the ALJ about why he could not work, plaintiff stated that he felt disabled due to shoulder, elbow, and back pain, along with daily nausea. (R. 33-35). In particular, plaintiff alleged being nauseous "pretty much every day," which caused him to lose thirty to forty pounds. (R. 46). He testified that he had a rotator cuff

tear along with "two tears in … the muscles that hold the ball in the socket" in his right shoulder, which necessitated surgery. (R. 35). Plaintiff further claimed to have chronic right elbow problems, despite surgery, and to have problems reaching with his right arm (R. 35, 38). Plaintiff placed special emphasis on his back problems, which radiate down his hips and into his legs: "[It] [b]others me all the time. I can't sleep … I'm probably up at least three to seven times a night every night … [because I] just can't get comfortable. (R. 38, 47). He sleeps four to five hours on average every night as a result, and needs to change positions roughly every half hour to handle the pain and discomfort. (R. 47-48). Chronic back pain also renders plaintiff unable to walk more than a couple blocks at a time and unable to lift more than ten or fifteen pounds. (R. 48). This pain is aggravated by cold weather. (R. 41, 188, 233).

Plaintiff allegedly has not worked since January 15, 2007 and spends most of his days in a recliner with his feet up due to his ailments. (R. 31-32, 50). He has no household responsibilities. (R. 44). Plaintiff's hobbies include fishing and hunting, but he cannot really enjoy either anymore due to debilitating back pain. (R. 45-46).

Since plaintiff had cited depression and anxiety in his original application but had not mentioned them at the hearing as reasons for disability, the ALJ felt it appropriate to question him on this topic. (R. 41). Plaintiff's depression and anxiety appear situational in nature, triggered by such events as an inability to pay his bills and maintain self-sufficiency. Id.

Plaintiff's medical records are extensive. During a May 14, 1996 examination by William Gillock, MD, for a workers' compensation claim, plaintiff reported a 1992 lower back injury, which stemmed from lifting a case of syrup. (R. 236). According to plaintiff, he received treatment for this injury from Dr. Donald Bobek, although no medical records encompassing this

injury have been provided. Id. Despite not needing surgery, plaintiff allegedly could not work for eighteen months and has noted persistent back pain since the injury. (R. 236-37).

On July 1, 1994, while working as a route salesman for Canteen Company, plaintiff injured his back. Id. As he lifted a case of beverages from the floor to a vending machine, he developed a sharp pain in his lower back and left leg, which migrated to his right leg over the next several days. Id. After seeing his primary care physician, Joe Haines, M.D. ("Dr. Haines"), an MRI scan of the lumbar spine found a "mild right sided disc bulge present at the L5-S1 level." (R. 254). Kenyon Kuglar, M.D. ("Dr. Kuglar"), of Neurosurgery, Inc., subsequently provided plaintiff with medical and physical therapy treatments for several weeks. In an August 1, 1994 letter, Dr. Kulgar described plaintiff's work-related back injury and his symptomology. (R. 246-49). The injury initially produced back pain radiating into plaintiff's left leg and was aggravated by walking. (R. 246). The pain migrated to his right leg all the way to the bottom of his foot, and felt worse at night or upon coughing and sneezing. Id. Nonsteroidal anti-inflammatory medication and muscle relaxants provided plaintiff with no relief, and the only way plaintiff could control the pain was by doing nothing. Id.

Despite reporting such disabling pain, an exam by Dr. Kuglar showed no definite evidence of radiculopathy and an MRI scan showed "essentially unchanged degeneration and bulging of the L5-S1 disk that was initially seen" in 1992, the first time plaintiff injured his back. (R. 247). Dr. Kuglar recommended a gradual increase in plaintiff's activities along with walking, back stretches and strengthening exercises. Id. Plaintiff reported no improvement since his injury at an August 10, 1994 visit, despite a month of physical therapy. (R. 245). Dr. Kulgar consequently referred him to a work hardening program to assess his degree of disability. Id. On August 12, 1994, plaintiff completed a Return to Work Program at St. John's Medical Center.

3

(R. 309-14). During his assessment, plaintiff complained of low back pain and intermittent right lower extremity pain. (R. 314). The assessor noted decreased range of motion in his hips and trunk, decreased lower extremity muscle strength, and abnormal posture. Id. In terms of functional capacity, plaintiff could easily move into and out of positions, with increasing discomfort in static positions like standing and sitting. Id. Still, the assessor reported that plaintiff could lift 45 pounds over his head, demonstrated a good use of body mechanics and good endurance, and maintained independence in all activities of daily living ("ADL"). Id. At November 8 and December 14, 1994 visits, plaintiff continued to report disabling back pain, with any attempts to return to work or strenuous activity exacerbating his condition. (R. 244). Dr. Kuglar noted that, since plaintiff had failed to find relief in conservative treatment methodologies, further testing would be needed and surgery should remain a possibility. Id. On May 22, 1995, an "unremarkable" myelogram found "good maintenance of the disk spaces at all levels and no instability with flexion and extension views." (R. 264). The myelogram caused plaintiff disabling headaches, necessitating an epidural blood patch. (R. 243). Due to plaintiff's continued back pain, Dr. Kuglar recommended further evaluation by Christopher Boxell, M.D. ("Dr. Boxell"), at Neurosurgery, Inc. Id.

On June 23, 1995, Dr. Boxell performed an "awake lumbar diskography," a series of injections intended to alleviate his back pain. (R. 262). This procedure led Dr. Boxell to diagnose plaintiff with discogenic low back pain and "single level degenerative lumbar disk disease with small intra-annular disk herniation towards the right at L5-S1." (R. 262-63, 322). At plaintiff's first office visit on July 25, 1995, Dr. Boxell recommended a lumbar discography study, to which plaintiff assented. (R. 249). Ultimately, on August 2, 1995, plaintiff needed a diskectomy at the L5-S1 level, during which Dr. Boxell implanted hardware in plaintiff's back. (R. 258-61,

336). At an August 29, 1995 visit, less than a month after his back surgery, plaintiff reported marked improvement in back pain compared to his preoperative status. (R. 242). The wound seemed to be healing well, and plaintiff's back was not significantly tender to palpitation. Id. Images of plaintiff's lumbar spine confirmed his remarkable progression since surgery. (R. 280). Still, plaintiff was "temporarily totally disabled" for six to twelve months, during which time he could not work. (R. 242).

At his next visit on September 28, 1995, Dr. Boxell noted plaintiff's increased range of motion and an ability to bend over without much difficulty. (R. 241). Despite plaintiff's complaints of a swollen, painful incision from surgery, Dr. Boxell remarked that the incision was healing well. Id. Plaintiff continued to do well into December 1995, as he completed a physical therapy exercise program. (R. 240). Consequently, on December 29, 1995, Dr. Boxell wrote plaintiff's employer a letter urging an approval of a six to twelve month health club membership for plaintiff, since his physical therapy was coming to an end. (R. 293). This request was subsequently denied, so in early February 1996, Dr. Boxell placed plaintiff in an outpatient work conditioning program at St. John's Medical Center. (R. 298). A work hardening progress evaluation assessment during this program revealed plaintiff was in excellent shape. Id. Functionally, plaintiff continued to perform lifting and carrying consistent with the demand level required for his job. Id. Although his tolerance for activity was fair, plaintiff did not have significant limitations to functional mobility and maintained good body mechanics. (R. 303). The assessors recommended plaintiff be discharged from the program because he had plateaued at the physical demand level needed to perform his job functions. (R. 299). During that month, Elizabeth Macedo, M.D., of Regional Radiology Wheeling confirmed plaintiff's satisfactory progression since surgery through images of his lumbar spine. (R. 276).

William Gillock, M.D. ("Dr. Gillock") completed an independent medical evaluation for a workers' compensation claim on May 14, 1996. (R. 236-37). Dr. Gillock concluded that plaintiff was not temporarily totally disabled and that he did not require any further medical treatment, including physical therapy, despite having 15% permanent partial impairment to his back. Id.

Notwithstanding Dr. Gillock's medical opinion, plaintiff continued treatment with Dr. Boxell. On August 1, 1996, Dr. Boxell determined that plaintiff had reached maximum medical benefit since his August 1995 back surgery. (R. 228). In a letter dated August 19, 1996, Dr. Boxell followed up on plaintiff's surgery. (R. 227). According to the AMA Guidelines to the Evaluation of Permanent Impairment, Third Edition (Revised), and in Dr. Boxell's opinion, plaintiff suffered from 16% permanent partial impairment related to his injury and subsequent surgery, 10% of which stemmed from a surgically treated disc lesion with residual, medically documented pain and rigidity and 6% of which stemmed from loss of motion in flexion, extension, lateral bending and rotation of the lumbar spine attributable to the procedure. Id.

At an August 4, 1997 visit, plaintiff reported continued back pain despite trying numerous anti-inflammatory medications, which prevented him from doing anything besides light work. (R. 225). After discussing removal of the Dyna-Lok segmental fixation device from his spine at the visit, plaintiff decided to undergo the procedure on January 23, 1998. (R. 225, 255-57, 330).[1] Postoperatively, plaintiff did well; he experienced the expected back soreness, but his wound healed well. (R. 330). He was discharged from St. John Medical Center three days later, on January 26, 1998. Id. Dr. Boxell released plaintiff to regular-duty work with a fifty-pound weight restriction, on April 2, 1998. (R. 221). Plaintiff returned to work by June 1998;

---

[1] The undersigned notes a discrepancy between plaintiff's testimony, which referenced this surgery in 1997, and the medical records, which document its occurrence in January 1998.

however, he reported that since resuming work, he had more pain in the low lumbar and sacral regions of his back, primarily later in the day and evenings. (R. 220). The only way plaintiff seemed to get relief was by resting and abstaining from work. Id.

The medical records jump at this point from June 1998 to June 2000. In particular, on June 2, 2000, Dr. Hale administered a right sacroiliac joint injection. (R. 291-92). Plaintiff told Dr. Boxell at an October 5, 2000 appointment that the injection provided relief for a mere four days, at which point his back pain returned. (R. 211). Dr. Boxell diagnosed plaintiff with sacroiliac join arthopathy as the source for his ongoing pain and opined that the condition likely resulted from stresses on his pelvis subsequent to his 1995 surgery. (R. 211, 216). He concluded that plaintiff's only real option was sacroiliac joint fusion. (R. 206). After receiving approval for the surgery from workers' compensation court in May 2001 (R. 203), plaintiff underwent sacroiliac joint fusion without complications at St. John's Medical Center on July 9, 2001. (R. 325-28). An x-ray of plaintiff's pelvis on July 17, 2001 showed the screws inserted during the fusion were "in excellent position" and the wound "look[ed] great." (R. 202).

At a September 20, 2001 visit, plaintiff reported increased pain and depression, primarily stemming from his late wife's death. (R. 199). After being placed on Effexor to manage his depression, plaintiff seemed somewhat better to Dr. Boxell a couple months later, although he was not pain-free. (R. 197). This ongoing pain led Dr. Boxell to opine on January 21, 2002 that "I think [plaintiff] is ultimately going to represent a continued failure, although I think his sacroiliac joint fusion is likely to heal." (R. 195). Plaintiff remained better than preoperatively, but not pain-free into April of 2002. (R. 193). Dr. Boxell stated that he was "doubtful that [plaintiff] will ever be able to return to work. He is considering applying for Social Security Disability benefits. I think that is probably in his best interest." Id.

In a letter to plaintiff's employer, Dr. Boxell reported that plaintiff had reached maximum medical benefit from his sacroiliac joint fusion as of April 17, 2002. (R. 191). Using the <u>AMA Guidelines to the Evaluation of Permanent Impairments</u>, Fourth Edition, Dr. Boxell opined that plaintiff gained an additional 5% functionality by undergoing the surgery, which reduced his permanent partial disability rating accordingly. <u>Id.</u>

On October 16, 2002, Dr. Boxell noted plaintiff's seeming improvement since his late wife's death; plaintiff still experienced back pain, but felt better and had begun working part-time. (R. 190). Plaintiff was "status quo," "cop[ing] as best he [could]" at his April 16, 2003 visit. (R. 189). At this time, Dr. Boxell prescribed Lexapro for more effective pain and depression management. <u>Id.</u> By April 19, 2004, plaintiff had developed a tolerance for his pain medications, which no longer provided effective pain management. (R. 185). In this regard, Dr. Boxell referred plaintiff to Jeff Calava, D.O. ("Dr. Calava"), of the Specialty Pain Management Center, for better alternatives to his current medication regimen. <u>Id.</u> Plaintiff was feeling better emotionally and planned to marry a woman he had met. <u>Id.</u>

At a June 21, 2004 comprehensive pain management evaluation with Dr. Calava, plaintiff complained of lumbar back pain and radiating lower extremity pain, which he described as a "throbbing dull ache." (R. 289). He was working fifty to sixty hours per week at the time. <u>Id.</u> Dr. Calava noted plaintiff's "grossly diminished" range of motion in all planes, and diagnosed him with degenerative disc disease and lumbar back pain, with referred hip and thigh pain. <u>Id.</u> Dr. Calava prescribed Methadone and encouraged plaintiff to quit smoking and increase his daily activity as tolerated. <u>Id.</u> Although the Methadone successfully managed plaintiff's chronic pain, he told Dr. Boxell on October 20, 2004 that he had to stop taking it due to severe nausea, emesis, and a thirty-pound weight loss. (R. 182-84, 285).

The next chronological entry in the medical records comes from August 16, 2005, when plaintiff had an x-ray of his left elbow. (R. 514). This x-ray showed no abnormalities. Id. Thereafter, the medical records jump to February 7, 2006, at which time plaintiff presented to Thomas Auxter, D.O. ("Dr. Auxter"), of St. Johns Physician Group for restless leg syndrome and insomnia. (R. 415-16). Dr. Auxter prescribed Restoril to combat these sleep issues. (R. 416). On February 16, 2006, plaintiff returned to Dr. Auxter's office because the Restoril proved ineffective. (R. 413). Dr. Auxter placed plaintiff on Ambien. (R. 414). Roughly a month later, plaintiff again reported "aching, constant insomnia," which had lasted over six months and requested an alternative sleeping medication. (R. 411). Dr. Auxter put plaintiff on Lunesta. (R. 412).

Martin Martucci, M.D. ("Dr. Martucci"), of Tulsa Pain Consultants saw plaintiff for an initial evaluation on April 3, 2006. Dr. Martucci diagnosed plaintiff with lumbar post fusion pain syndrome and characterized plaintiff as a reasonable candidate for opioids, since he had tried multiple non-narcotic medications in the past without success. (R. 286). Plaintiff received a duragesic patch in an effort to reduce his pain and enable him to continue working. Id. While plaintiff did not want to consider another back surgery, Dr. Martucci stated that a trial of dorsal column stimulation should be considered, and that plaintiff might ultimately require a paddle lead if more conservative treatment methods proved ineffective. (R. 286-87). Plaintiff received a caudal epidural steroid injection from Dr. Martucci on April 17, 2006. (R. 345-46). At his June 1, 2006 appointment, plaintiff was pleased with the duragesic patch; however, the injection did not help at all. (R. 342). Dr. Martucci therefore decided to keep plaintiff on the duragesic patch but scheduled no further injections. Id. Plaintiff described his lower back pain in August 2006 as

intractable and constant, and rated it a six out of ten on a scale of one to ten. (R. 285). Plaintiff further reported that standing, walking, twisting, and lifting worsened the pain. Id.

On October 4, 2006, plaintiff presented to Dr. Auxter with chronic nausea. (R. 405). Plaintiff stated that he woke up nauseated every morning, and remained nauseated until he vomited. Id. He denied any other abdominal problems besides nausea, and was put on Prilosec. (R. 405-06).

When plaintiff returned to Dr. Martucci on November 30, 2006, he received a higher-dose duragesic patch to manage his back pain. (R. 339-41, 364-66). Increased back and shoulder pain continued to impact plaintiff on April 16, 2007, when he presented to Dr. Martucci requesting a medication change for better pain management. (R. 362). Dr. Martucci's impression was that plaintiff had post lumbar fusion pain along with resolving left epicondylitis. Id. After changing plaintiff's medications, Dr. Martucci referred plaintiff to Jaafar Bazih, M.D. ("Dr. Bazih"), an orthopedic surgeon. Id. Plaintiff returned to Dr. Martucci's office on January 26, 2007, complaining of waxing and waning left elbow pain, despite normal x-rays in the past. (R. 403). This elbow pain was triggered by repetitive motion and aggravated by gripping. (R. 403-04). An injection provided no relief, so Dr. Martucci advised plaintiff to continue his current medications to help manage his pain. Id.

On March 5, 2007, plaintiff presented at Dr. Auxter's office for a right wrist laceration, which he received when a piece of steel fell off a forklift at work. (R. 401). While it is questionable that the isolated, work-related incident amounts to substantial gainful activity, the ALJ noted that it occurred subsequent to the alleged onset date of plaintiff's disability and remained unexplained by plaintiff. (R. 21).

On May 14, 2007, Judy Marks-Snelling, D.O., M.P.H. ("Dr. Marks-Snelling"), completed a Physical Residual Functional Capacity Assessment. (R. 352). She diagnosed plaintiff with "degenerative disk disease, status/post lumbar fusion." Id. She also placed some exertional limitations on plaintiff. In particular, Dr. Marks-Snelling felt plaintiff could frequently and/or occasionally lift and carry ten pounds. (R. 353). Within an eight-hour workday, plaintiff needed to walk or stand for two to four hours and could sit for six hours. Id. Dr. Marks-Snelling did not place any restrictions on plaintiff's pushing and pulling abilities, including the operation of hand or foot controls. Id. She referred to plaintiff's three back surgeries and remarked that plaintiff had a hard time with pain management. Id. While plaintiff had occasional postural limitations, Dr. Marks-Snelling felt that he had no manipulative, visual, communicative, or environmental limitations. (R. 354-56).

On June 29, 2007, Dr. Bazih performed decompressive surgery on plaintiff's left epicondyle, as noted by Dr. Martucci in a July 19, 2007 progress note. (R. 360). Plaintiff felt the surgery helped him significantly, despite continuing lower back pain, insomnia, and pain-related depression. Id. Since none of his prior methods succeeded, Dr. Martucci started plaintiff on Cymbalta and scheduled him for a trial of spinal cord stimulation, which would require placement of a paddle lead to "gain coverage of the axial spine." Id.

Despite such symptomology in June, plaintiff presented to Dr. Auxter on October 3, 2007 to obtain a letter for a crossbow hunting permit. (R. 392). While Dr. Auxter noted that plaintiff had arthralgia, joint stiffness in his elbow from surgery, back pain, and muscle cramps, he also remarked that plaintiff was in "no distress" and had "no complaints" regarding medication. Id. Moreover, the fact that plaintiff sought primarily to obtain a letter for a crossbow hunting permit that day suggests less severe symptoms.

At follow-up visits with Dr. Martucci on October 17, 2007 and January 16, 2008, lower back pain remained a primary focus. (R. 377, 379). Dr. Martucci noted that while plaintiff could participate in ADL, he suffered from chronic pain to the midline and bilateral paralumbar region of his lumbar spine. (R. 377). At a July 15, 2008 visit, Dr. Martucci diagnosed plaintiff with lower extremity radiculopathy, in addition to post lumbar fusion pain and resolving left epicondylitis, and placed plaintiff on Neurontin "for better nerve pain control." (R. 382).

On October 15, 2008, plaintiff presented at Dr. Auxter's office, complaining of chronic right shoulder pain with crepitus and neck popping, which, according to plaintiff, were gradually worsening. (R. 388). Reaching upwards, internal rotation, and elbow flexion against resistance all aggravated these ailments. Id. Dr. Auxter recommended an MRI on plaintiff's right shoulder. Id. Jon Orjala, D.O. ("Dr. Orjala"), of Bailey Medical Center ultimately referred plaintiff for this MRI, due to his pain and limited range of motion. (R. 422-23). Geoffrey Day, M.D. ("Dr. Day"), of Bailey Medical Center found the following issues with plaintiff's right shoulder through the MRI: (1) a partial intrasubstance tear or, alternatively, supraspinatus tendinopathy of the distal supraspinatus tendon, with no obvious evidence for a rotator cuff tear; (2) AC joint hypertrophy, which possibly stemmed from impingement syndrome; and (3) abnormal appearance of the anterior superior glenoid labral cartilage, potentially due to a glenoid labral tear that would necessitate a follow-up arthoscopy. (R. 422). Given these problems, Dr. Orjala performed a "right shoulder arthoscopic surgery with rotator cuff repair, Bankart repair, SLAP repair, glenoid labral tear debridement and subacromial decompression" on December 1, 2008. (R. 418). The surgery led Dr. Orjala to diagnose plaintiff with a rotator cuff tear, anterior/inferior instability, a glenoid labral tear, subacromial impingement, and a SLAP type II lesion – all in his right shoulder. Id. Plaintiff recovered from the surgery without complications. (R. 419).

On January 26, 2009, plaintiff presented to Fred Ingram, D.O.("Dr. Ingram"), at St. Johns Physician Group with lower left quadrant abdominal pain, which he had been experiencing for three weeks. (R. 497). Plaintiff described the pain as aching, constant, and worsening. Id. At his next doctor's appointment on February 5, 2009 with Jerry Crain, D.O. ("Dr. Crain"), his primary care physician, plaintiff was experiencing severe nausea. (R. 499). Dr. Crain noticed a lower left quadrant abdominal mass, which was tender to palpitation, and immediately performed a CAT scan. Id. The CAT scan revealed inflammation, with evidence of diverticulitis, including an "early abscess." (R. 429, 507). Dr. Crain treated plaintiff on an outpatient basis with two rounds of antibiotics. (R. 429). He also immediately referred plaintiff to Unnithan Raghuraman, M.D. ("Dr. Raghuraman"), a gastroenterologist, for a colonoscopy. (R. 499). In his referral, Dr. Crain noted that plaintiff suffered from constipation, severe diverticulitis, nausea with vomiting, and had an abnormal gastrointestinal x-ray. (R. 501, 505).

Plaintiff was admitted to St. John's Medical Center with abdominal pain on February 23, 2009. (R. 427). When Dr. Raghuraman saw plaintiff the next day in the hospital, he expressed concern about residual infection or an unknown source for the ongoing pain, and ordered another CAT scan of plaintiff's abdomen. (R. 429). CAT scans ultimately revealed slight pericolic thickening of the descending colon and extensive fecal material throughout the colon, but were otherwise normal. (R. 427, 435, 507). With these results in mind, Joseph Moore, M.D., opined that plaintiff's lower left quadrant pain had been due to inflammation from diverticulitis as opposed to malignancy. (R. 431). Upon discharge on February 24, 2009, the final diagnoses were entered: a history of diverticulitis, which had been resolved; chronic narcotic dependence; chronic back pain; and tobacco dependence. (R. 427). Discharge records also reflect that plaintiff "did not appear acutely ill" and displayed "no signs of active infection." Id.

On March 19, 2009, Dr. Raghuraman performed a colonoscopy on plaintiff. (R. 443-45). Dr. Raghuraman subsequently diagnosed plaintiff with a descending, "partially obstructing" colon mass, likely cancer, which had prevented him from completing the colonoscopy. (R. 443). Dr. Raghuraman further found left-sided diverticulitis, along with moderate to severe gastritis, which probably stemmed from plaintiff's dependence on nonsteroidal anti-inflammatory drugs. Id. Later that day, pathologist, John Minielly, M.D., diagnosed plaintiff with "descending colon, biopsy-invasive moderately differentiated adenocarcinoma." (R. 449). The following day, an upper abdominal sonogram revealed small polyps in plaintiff's gallbladder. (R. 452). Dr. Raghuraman told plaintiff he would need colon surgery as soon as possible. (R. 507-09). A PET CT scan on April 1, 2009 of plaintiff's whole body confirmed an "avid malignant tumor of the descending colon." (R. 521).

Plaintiff was admitted to St. John Medical Center for colon surgery on April 3, 2009. (R. 450-60). A laproscopic left colectomy and intraoperative colonoscopy found descending colon cancer, an ascending colon polyp, and a transverse colon polyp, all of which were removed during surgery. (R. 468, 480-82). Pathologist, Igor Shendrik, M.D., found that, post-surgery, the surgical margins were tumor-tree, and 33 lymph nodes tested negative for metastatic carcinoma. (R. 478). Plaintiff did remarkably well after his surgery and was discharged on April 5, 2009. (R. 460). In fact, at a follow-up appointment with Dr. Crain on April 21, 2009, other than some slight oozing from the incision site, plaintiff was doing well. (R. 512). Plaintiff was eating normally again, and reported regular bowel movements. Id.

On June 18, 2009, Dr. Boxell prepared a letter for plaintiff's disability claim. (R. 546). In the letter, Dr. Boxell referenced plaintiff's colon cancer and reported that plaintiff had suffered a partial amputation of his left thumb, which required additional hand surgery. Id. This is the only

reference in the record to any hand and limb problems; in fact, no medical evidence of record ever documents such problems. Dr. Boxell went on to describe plaintiff's three back surgeries, which did not provide much relief. Id. Plaintiff therefore required chronic narcotic therapy for pain management. Id. Regarding plaintiff's disability claim, Dr. Boxell opined the following:

> [i]t is my belief that this gentleman does suffer real disability related to his failed back surgery syndrome and is deserving of consideration for Social Security disability benefits. I think it is highly improbable at this time, that this gentleman, at his age, is likely to be retrainable and returned to the work force. It is my opinion that he is deserving of Social Security disability benefits.

Id.

## Procedural History

Plaintiff protectively filed a Title II application for disability insurance benefits ("DIB") on January 25, 2007, alleging a disability onset date of January 15, 2007. (R. 15, 29).[2] The Commissioner denied plaintiff's application initially on May 14, 2007, and on reconsideration September 4, 2007. (R. 15, 29, 62-65, 69-71). Plaintiff filed a request for hearing before an Administrative Law Judge ("ALJ") on September 19, 2007. (R. 15, 29). The ALJ held a hearing on November 20, 2008, in Tulsa, Oklahoma and, in his April 16, 2009, decision, denied plaintiff's claim for disability. (R. 15, 23, 26, 82-88). Plaintiff requested review of the ALJ's decision on April 16, 2009. (R. 1). In a Notice of Appeals Council Action dated December 14, 2010, the Appeals Council denied plaintiff's request for review. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 404.981, § 416.1481.

---

[2] The undersigned notes that plaintiff filed both Title II and Title XVI applications on January 25, 2007. (R. 101-11). However, everything in the record subsequent to the application date refers exclusively to the Title II application. This is most likely attributable to clerical error, and since determination of plaintiff's disability status is the same for both claims, such error ultimately is inconsequential.

## Social Security Law and Standard of Review

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In particular, disability is characterized as a physical and mental impairment that "results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques" administered by "acceptable medical sources," such as licensed and certified psychologists and physicians. 42 U.S.C. § 423 (d)(3), and 20 C.F.R. §§ 404.1513, 416.913. A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). A claimant for disability benefits bears the burden of proving that he is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). To meet this burden, the claimant must provide medical evidence of a severe impairment during the relevant adjudicated period. 20 C.F.R. §§ 404.1512(b), 416.912(b).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; see also Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).[3] "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Id. at 750.

---

[3] Step One requires the claimant to establish that he is not engaged is substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.910. Step Two requires that the claimant prove he has a medically severe impairment or combination of impairments that significantly limit his ability

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). This Court's review is constrained to two inquiries: first, whether the decision was

supported by substantial evidence; and second, whether the correct legal standards were applied.

Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted). Substantial

evidence is more than a mere scintilla, less than a preponderance, and is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales,

402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229

(1938)). The Court may neither reweigh the evidence nor substitute its judgment for that of the

Commissioner. See Casias v. Secretary of Health & Human Service, 933 F.2d 799, 800 (10th

Cir. 1991).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that plaintiff had not engaged in substantial gainful activity

since January 15, 2007, the alleged onset date. (R. 17). At Step Two, the ALJ determined that

plaintiff had the following severe impairments: status post L5-S1 diskectomy and fusion; status

post rotator cuff repair, epicondylitis of the elbow, and depression and anxiety. Id. At Step Three,

the ALJ found that plaintiff's impairment(s) did not meet or medically equal any of the listed

---

to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is engaged
in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe
(Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared
with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A claimant suffering from
an impairment or impairments "medically equivalent" to a listed impairment is determined to be
disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant
must establish that he does not retain the RFC to perform his past relevant work. If the claimant's
Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that
work exists in significant numbers in the national economy which the claimant, taking into
account his age, education, work experience, and RFC, can perform. See Dikeman v. Halter, 245
F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that
the impairment which precluded the performance of past relevant work does not preclude
alternative work. 20 C.F.R. §§ 404.1520, 416.920.

impairments. Id. Regarding section 1.04 (spine disorders), the ALJ found a lack of evidence for

degenerative disc disease leading to the compromise of a nerve root or the spinal cord. Id. Such a

condition would be evidenced by nerve root compression, spinal arachnoiditis, or lumbar spinal

stenosis, all of which the plaintiff did not have. Id. The ALJ also felt that plaintiff's issues did

not equate to Listing 1.02 pertaining to major joint dysfunction; more specifically, there was a

dearth of medical evidence documenting gross anatomical deformity, chronic joint pain, and

stiffness. Id. Plaintiff further failed to display signs of limited motion or abnormal motion in

affected joint(s). Id. Moreover, no imaging devices found joint space narrowing, bony

deconstruction, or ankylosis in affected joint(s), which had involved one major peripheral

weight-bearing joint and which had resulted in ineffective ambulation or ineffective fine/gross

motor movements. (R. 18).

 The ALJ additionally held that plaintiff's mental impairments, considered individually

and collectively, did not meet or medically equal the criteria of sections 12.04 (affective

disorders) and 12.06 (anxiety-related disorders). Id. In particular, after careful consideration, the

ALJ found that plaintiff did not meet the "paragraph B" criteria.[4] Noting that plaintiff described

limiting his daily activities, including household chores, and that plaintiff's physician stated he

could participate in ADL, the ALJ concluded that plaintiff only had mild restriction in ADL. Id.

The ALJ also found mild difficulties in plaintiff's social functioning, since plaintiff spent the

---

[4] The "Paragraph B Criteria" in the Listing of Impairments establishes broad categories used to
assess the severity of a mental impairment. To satisfy Paragraph B, the impairment(s) must result
in at least two of the following: (1) marked restriction in ADL; (2) marked difficulties in
maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence,
or pace; or (4) repeated episodes of decompensation, each of extended duration. Repeated
episodes of decompensation, each of extended duration, means three episodes within a year, or
an average of one every four months, which lasts at least two weeks. Social Security Ruling
("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00B. See also Carpenter v.
Astrue, 537 F.3d 1264, 1268-9 (10th Cir. 2008).

majority of his time at home in his recliner. Id. Plaintiff had not claimed any restrictions regarding concentration, persistence, or pace, and had not alleged any episodes of decompensation. Id. Since plaintiff's mental impairments did not cause at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria were not met. Id. Plaintiff also did not satisfy the "paragraph C" criteria.[5]

The ALJ then determined that plaintiff had the RFC to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a). (R. 19). More specifically, plaintiff could lift and carry ten pounds, stand and walk two hours in an eight-hour workday in thirty minute intervals, and sit six hours in an eight-hour workday in thirty minute intervals Id. However, he was restricted in the following ways:

> [H]e is limited to occasional climbing, bending, stooping, squatting, kneeling, crouching, crawling, pushing and pulling. He has a slight limitation in reaching in all directions. He must avoid cold. He must have easy access to restrooms. He must have simple, repetitive, and routine work. He has a slight limitation in contact with the public, co-workers and supervisors. His contact with the public and co-workers should be brief and cursory. He should not be involved in goal setting.

Id.

The ALJ then summarized plaintiff's testimony regarding his impairments. According to the ALJ, plaintiff testified that he suffered from daily nausea, which could last an hour to all day.

---

[5] To meet the "Paragraph C" criteria, a claimant must have a medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least two years' duration, which has resulted in more than minimal limitation to perform basic work activities, with symptoms or signs currently managed by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or a change of environment would predictable cause the individual to decompensate; or (3) a current history of one of more years' inability to function outside a highly supportive living arrangement, with evidence of continued need for such an arrangement. SSR 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.

Id. Plaintiff further stated that rotator cuff tears caused his shoulder to become dislodged, ultimately necessitating surgery. He had chronic back pain radiating down through his hips and legs, which necessitated three back surgeries and caused him substantial problems sleeping. Id. Plaintiff only slept four or five hours at night. Id. Moreover, back pain a couple weeks earlier led plaintiff to leave after fishing a mere fifteen minutes because he could not sit still. Id. His doctor advised him to have a stimulator implanted in his back, but he could not afford one. (R. 20). Tendonitis in the left elbow caused plaintiff trouble lifting a gallon of milk. (R. 19). In terms of household chores, while plaintiff occasionally cooked, he did not do dishes, sweep, or mop. Id. He could only sit twenty or thirty minutes at a time, and spent most of the day in a recliner with his feet up, except when taking out the dogs. Id. Plaintiff felt he could only walk two blocks without rest, and could lift ten to fifteen pounds maximum. (R. 19-20).

The ALJ found plaintiff's testimony regarding the intensity, persistence, and limiting effects of his symptoms less than credible. (R. 20). In reaching this conclusion, the ALJ referenced the state Disability Determination Service ("DDS") medical consultant's expert assessment, which found that plaintiff could reasonably be expected to perform at a sedentary exertional level with certain limitations. Id. In particular, plaintiff could lift or carry up to ten pounds, stand and walk two hours in an eight hour workday, sit six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl. Id. (citing Ex. 5F). Even Dr. Martucci, a treating physician, reported in plaintiff's progress notes that his straight leg test was negative and that he could participate in ADL. (R. 21) (citing Ex. 9F). Dr. Martucci also observed that plaintiff did not use a walking assistive device and could stand from a seated position without much difficulty. (R. 20) (citing Ex. 9F). The ALJ went on to discuss the following inconsistencies between plaintiff's testimony and the medical evidence of record:

> The claimant's statements were inconsistent with regard to the alleged severity of the claimant's limitations due to nausea, pain in his back and shoulders. The claimant alleged he has difficulty with household chores, can stand and sit only 20 to 30 minutes and walk two blocks and has trouble picking up a gallon of milk. His alleged onset date is January 15, 2007. Yet, on January 26, 2007, the claimant denied abdominal pain or nausea in progress notes by St. John Physicians Group. On March 5, 2007 the claimant received a wrist laceration from a piece of steel at work. This reference to the claimant working is not explained by the record. On October 3, 2007, the claimant requested a crossbow hunting permit from his doctor. On that date, he again denied abdomen issues, including nausea. In October 2006, prior to the onset date, he complained of nausea. The claimant is not credible in his allegation that he has nausea every day. The occurrences of nausea appear to [be] highly sporadic in nature.

(R. 21). Considering the incongruity between plaintiff's testimony and the medical evidence of record, including plaintiff's unexplained work incident, plaintiff's request for a crossbow hunting permit, and plaintiff's irregular complaints of nausea to his treating physicians, the ALJ concluded that plaintiff's testimony was not credible. (R. 15). The ALJ further concluded that his RFC assessment was supported by the opinion of the state agency physician and the record as a whole. (R. 21).

At Step Four, the ALJ found that plaintiff was unable to perform any past relevant work. Id. At Step Five, the ALJ determined that jobs exist in significant numbers in the national economy that plaintiff could perform, taking into account his age, education, work experience, and RFC. (R. 22). In particular, the vocational expert determined that plaintiff could work in such representative occupations as trimmer and clerical mailer. Id. The ALJ consequently concluded that plaintiff was not disabled. (R. 23).

### Review

On appeal, plaintiff asserts that the ALJ erred in his credibility analysis of plaintiff's testimony and, as a result, erred in his RFC assessment.

Credibility determinations are peculiarly the province of the finder of fact, and as such are given great deference. See Hamilton v. Secretary of Health & Human Services, 961 F.2d 1495, 1499 (10th Cir. 1992). As noted by the court in White v. Barnhart, 287 F.3d 903, 910 (10th Cir. 2001):

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

In evaluating credibility, an ALJ must provide specific reasons that are closely linked to substantial evidence. See Kepler v. Chater, 68 F.3d 387 (10th Cir. 1995); S.S.R. 96-7p, 1996 WL 374186. For instance, in Kepler the Tenth Circuit held that the ALJ's credibility assessment was insufficient because the ALJ simply recited the general factors he considered and then stated that the plaintiff was not credible based on those factors. Id. at 391-92. The Tenth Circuit explained that the ALJ must refer to the specific evidence on which he relies in determining credibility and link his credibility findings to such specific evidence. Id. at 391. However, "Kepler does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating a claimant's credibility, the dictates of Kepler are satisfied." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

Although plaintiff testified at the hearing that he suffered from nausea "pretty much every day," the ALJ cited progress notes from January 26, 2007 and October 3, 2007, both after the alleged onset date, in which plaintiff denied abdominal pain or nausea. (R. 21). Similar notes exist for February 7, 2006, February 16, 2006, March 2, 2006, and April 3, 2006, (all prior to the alleged onset date). (R. 35, 392, 403, 405, 411, 413, 415). Moreover, as noted by the ALJ, on October 4, 2006, prior to the alleged onset date, plaintiff reported nausea in the morning, diarrhea, and constipation. (R. 21, 405). The ALJ also cites to medical records, all dated after the

alleged onset date, indicating that plaintiff "received a wrist laceration from a piece of steel at work." Other medical records cited by the ALJ indicate that plaintiff applied for a crossbow hunting permit on the same day he claimed not to be experiencing any abdominal issues, including nausea. (R. 21). The facts cited by the ALJ are sufficient to uphold the ALJ's credibility determination in so far as that determination relates to plaintiff's nausea.[6]

Moreover, the facts cited by the ALJ are also sufficient to support the ALJ's credibility determination regarding plaintiff's back and shoulder pain, since they reflect a willingness on plaintiff's part to misrepresent and exaggerate his symptoms, particularly in light of the sparse medical evidence (other than plaintiff's own subjective statements) that his physical condition actually results in the level of pain plaintiff claims to be experiencing. By way of example, despite reporting disabling pain, an exam by Dr. Kuglar showed no definite evidence of radiculopathy, and an MRI scan showed "essentially unchanged degeneration and bulging of the L5-S1 disk that was initially seen" in 1992, the first time plaintiff injured his back. (R. 247). Dr. Kuglar recommended a gradual increase in plaintiff's activities along with walking, back stretches and strengthening exercises. Id. On September 28, 1995, Dr. Boxell noted plaintiff's increased range of motion and an ability to bend over without much difficulty. (R. 241). In fact, despite plaintiff's complaints of a swollen, painful incision from surgery, Dr. Boxell remarked that the incision was healing well. Id. Later, Dr. Macedo confirmed plaintiff's satisfactory progression since surgery through images of his lumbar spine. (R. 276). In addition, Dr. Gillock completed an independent medical evaluation for a workers' compensation claim on May 14, 1996 and concluded that plaintiff was not temporarily totally disabled and that he did not require

---

[6] In addition, although plaintiff had a number of cancerous tumors and polyps removed from his abdominal area in 2009, his prognosis was good and the medical records indicate no further ongoing abdominal issues.

any further medical treatment. (R. 236-37). In July, 2001, plaintiff underwent sacroiliac joint fusion without complications at St. John's Medical Center. (R. 325-28). An x-ray of plaintiff's pelvis on July 17, 2001, showed the screws inserted during the fusion were "in excellent position" and the wound "look[ed] great." (R. 202).

The medical records regarding plaintiff's shoulder injury do not yield a different result.

Despite the sufficiency of the evidence; however, the ALJ failed to explain his credibility finding as it relates to plaintiff's back and shoulders. Had the ALJ noted the objective medical evidence (referenced above) and reasoned that it does not support plaintiff's claims of disabling pain, the ALJ's analysis would have been sufficient. Likewise, had the ALJ made clear that based on his credibility findings regarding plaintiff's complaints of nausea, he was concluding that plaintiff was simply not credible and, therefore, was rejecting all of plaintiff's subjective complaints of pain, the ALJ's analysis would have been sufficient. Finally, had the ALJ related plaintiff's request for a crossbow permit and his unexplained return to work to plaintiff's back and shoulder pain, the analysis would have been sufficient. And, although each of these conclusions can be inferred from the ALJ's decision and the record, that is not enough. The ALJ must provide the analysis himself. Instead, he merely concluded that plaintiff's "statements were inconsistent with regard to the alleged severity of [his] limitations due to . . . pain in his back and shoulders." (R. 21). The failure to provide any other analysis requires this matter to be remanded as set forth below.

### Conclusion

The ALJ's credibility finding as it relates to plaintiff's limitations resulting from nausea or abdominal pain is AFFIRMED, but his credibility finding with respect to plaintiff's limitations resulting from plaintiff's back and shoulders is REMANDED with directions for the

ALJ to explain his reasoning as set forth herein. Only if the ALJ finds that plaintiff's complaints of disabling pain with respect to his back and shoulders are credible, should the ALJ revisit his step five determination.

SO ORDERED this 18th day of July, 2012.


T. Lane Wilson
United States Magistrate Judge